# scleroplex inc.

**Bharani Padmanabhan MD PhD**
**Multiple Sclerosis Neurologist**
30 Gardner Rd. Suite 6A, Brookline MA 02445
+1 617 566 6047 phone + fax

29 July 2013

SWORN AFFIDAVIT (8 pages)
in the matter of
Brian Evans v. Leapfrog Group, Leah Binder, Robert Wood Johnson Foundation

# Exhibit E

# SPECIAL ARTICLES

## INCIDENCE OF ADVERSE EVENTS AND NEGLIGENCE IN HOSPITALIZED PATIENTS

### Results of the Harvard Medical Practice Study I

Troyen A. Brennan, M.P.H., M.D., J.D., Lucian L. Leape, M.D., Nan M. Laird, Ph.D., Liesi Hebert, Sc.D., A. Russell Localio, J.D., M.S., M.P.H., Ann G. Lawthers, Sc.D., Joseph P. Newhouse, Ph.D., Paul C. Weiler, LL.M., and Howard H. Hiatt, M.D.

**Abstract** *Background.* As part of an interdisciplinary study of medical injury and malpractice litigation, we estimated the incidence of adverse events, defined as injuries caused by medical management, and of the subgroup of such injuries that resulted from negligent or substandard care.

*Methods.* We reviewed 30,121 randomly selected records from 51 randomly selected acute care, nonpsychiatric hospitals in New York State in 1984. We then developed population estimates of injuries and computed rates according to the age and sex of the patients as well as the specialties of the physicians.

*Results.* Adverse events occurred in 3.7 percent of the hospitalizations (95 percent confidence interval, 3.2 to 4.2), and 27.6 percent of the adverse events were due to negligence (95 percent confidence interval, 22.5 to 32.6). Although 70.5 percent of the adverse events gave rise to disability lasting less than six months, 2.6 percent caused permanently disabling injuries and 13.6 percent led to death. The percentage of adverse events attributable to negligence increased in the categories of more severe injuries (Wald test $\chi^2$ = 21.04, P<0.0001). Using weighted totals, we estimated that among the 2,671,863 patients discharged from New York hospitals in 1984 there were 98,609 adverse events and 27,179 adverse events involving negligence. Rates of adverse events rose with age (P<0.0001). The percentage of adverse events due to negligence was markedly higher among the elderly (P<0.01). There were significant differences in rates of adverse events among categories of clinical specialties (P<0.0001), but no differences in the percentage due to negligence.

*Conclusions.* There is a substantial amount of injury to patients from medical management, and many injuries are the result of substandard care. (N Engl J Med 1991; 324:370-6.)

OVER the past decade there has been a steady increase in the number of malpractice claims brought against health care providers[1,2] and in the monetary damages awarded to plaintiffs.[3-5] This increase has precipitated numerous state programs designed to moderate the number of claims and encourage providers to develop quality-of-care initiatives.[6,7] Advocates of tort reform argue that the existing system of malpractice litigation is inefficient in compensating patients injured by medical practice and in deterring the performance of poor-quality care that is sometimes responsible for the injuries.[8] Others defend the role of tort litigation.[9] These debates will probably continue even as claims rates begin to decrease.[10]

Controversy over the virtues of common-law malpractice litigation occurs without much empirical information regarding the epidemiology of poor-quality care and iatrogenic injury. The most widely quoted estimates of the incidence of iatrogenic injury and substandard care were developed over 10 years ago.[11] Other reviews by physicians to identify poor-quality care or adverse events have been restricted to nonrandom samples of much smaller numbers of records.[12,13]

To address the need for empirical information, we undertook the Harvard Medical Practice Study. A primary goal was to develop more current and more reliable estimates of the incidence of adverse events and negligence in hospitalized patients. We defined an adverse event as an injury that was caused by medical management (rather than the underlying disease) and that prolonged the hospitalization, produced a disability at the time of discharge, or both. We defined negligence as care that fell below the standard expected of physicians in their community. To estimate the incidence of these critical events, we reviewed a random sample of more than 31,000 hospital records using techniques we have previously described.[14-16]

## METHODS

### Sample Selection and Record Review

We have presented our methods of record review and our sampling strategy in detail elsewhere.[16] We used a two-stage sampling process to create a weighted sample of 31,429 records of hospitalized patients from a population of 2,671,863 nonpsychiatric patients discharged from nonfederal acute care hospitals in New York in 1984. Initially, the records were screened by trained nurses and medical-records analysts; if a record was screened as positive, two physicians independently reviewed it. The physicians, almost all of whom were board-certified internists or surgeons, were trained by us to assess the medical records for evidence of adverse events and negligence (Appendix I) and to grade

From the Division of General Medicine, Brigham and Women's Hospital and Harvard Medical School (T.A.B., H.H.H.), the Department of Health Policy and Management, Harvard School of Public Health (L.L.L., L.H., A.R.L., A.G.L., J.P.N., H.H.H.), the Department of Biostatistics, Harvard School of Public Health (N.M.L.), and the Department of Health Care Policy, Harvard Medical School (J.P.N.), all in Boston; and the Kennedy School of Government, Harvard University (J.P.N.), and Harvard Law School (P.C.W.), both in Cambridge, Mass. Address reprint requests to Dr. Brennan at the Division of General Medicine, Brigham and Women's Hospital, 75 Francis St., Boston, MA 02115.

Presented in part at the Annual Meeting of the Association of American Physicians, Washington, D.C., May 6, 1990.

Dr. Brennan is a Research and Teaching Scholar of the American College of Physicians.

The New England Journal of Medicine
Downloaded from nejm.org by BHARANIDHARAN PADMANABHAN on May 17, 2013. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

Case 1:13-cv-00269-SOM-BMK   Document 27-5   Filed 08/02/13   Page 3 of 6
                                     PageID.194

their confidence that an adverse event had occurred on a scale of 0 to 6 (the causation score).

Because we were interested in estimating the statewide incidence of adverse events, the physician-reviewers recorded not only adverse events that occurred and were discovered during the index hospitalization, but also those caused by medical management before the index hospitalization and first discovered during it. In calculating incidence rates, we counted only events discovered during the sampled 1984 hospitalizations. By including adverse events that occurred earlier but were first discovered during the index hospitalization, we compensated for adverse events caused during the index hospitalization but discovered only after discharge. In order to avoid overstating incidence, we excluded events that were caused during the 1984 index hospitalization but were discovered during a subsequent hospitalization in 1984.

If the reviewers' confidence in the occurrence of an adverse event was greater than 1 on a six-point scale, they assessed the disability it caused. Next, they judged whether there was evidence of negligence and indicated their level of confidence in that judgment. Throughout the process, they could consult New York specialists recruited for the purpose. Discrepancies between the two physician-reviewers in the identification of adverse events were noted by a medical-records-analysis supervisor overseeing the screening process and were resolved in an independent review by a supervising physician (one of six physicians from Boston who directed the record review in one region in New York).

### Testing Reliability and Validity

To test the validity of the process of screening by medical-records analysts, 1 percent of all records were reviewed again by a medical-records-analysis supervisor using a blank screening form. The validity of the initial review was tested by considering the supervisor's review a gold standard.

The reliability of judgments of adverse events (causation) and substandard care (negligence) was tested by a team consisting of a medical-records-analysis supervisor, several physician-reviewers, and a physician-supervisor, which completed a second review of all records initially screened as positive at two hospitals. The results of this review were compared with those of the original review, with use of the kappa statistic.

### Follow-up of Missing Records and Adjustments

Several months after the initial review of records, we asked all the hospitals to attempt to identify the current status of any records that they had not located earlier. We reviewed all the records found in this follow-up search, using our regular review process. This enabled us to estimate the rates of adverse events and negligence in missing records. We also adjusted for possible differential selection of missing records according to hospital and case type, and we used imputation to fill in the missing items of data, conditional on a reviewer's response to other items.[17]

### Definition of Variables

To establish that an adverse event or negligence had occurred, we used as a criterion an average confidence score of 4 or higher (on a six-point scale). For patient-disability scores we used the ratings given by both reviewers and assigned half the weight for each case to each of the two reviewers. Data concerning age, sex, and primary discharge diagnosis were obtained from the data base of the New York Statewide Planning and Research Cooperative System (SPARCS).[18] Specialties were determined on the basis of diagnosis-related groups (DRGs) (Appendix II).

### Statistical Analysis

We report our results as the percentage of discharges with adverse events, the percentage of adverse events due to negligence, and population estimates of the numbers of adverse events and adverse events due to negligence according to disability category. We calculated all percentages and population projections using the selection weights, adjusted as described above. We used the SESUDAAN software package to calculate standard errors.[19] The significance of differences in rates was tested with the Wald statistic.

For five age groups we computed the crude rate of adverse events and a rate directly standardized to control for the inherent risk that a particular diagnosis would give rise to an adverse event. We standardized the rate using four risk categories obtained as follows. Three physician-supervisors individually rated all 470 DRGs on a scale of 1 to 6, reflecting their belief that the DRG was most (6) or least (1) likely, on clinical grounds, to be associated with an adverse event. We averaged the three ratings to define four risk categories of DRG (Appendix II). We did not standardize the percentage of negligence according to DRG risk. Since the denominator of the percentage of negligence was the number of adverse events, this acted as an implicit control for the complexity of care.

To compare rates of adverse events and negligence according to sex, we used directly standardized rates controlling for five categories of patient age and four categories of risk that a particular diagnosis would give rise to an adverse event. Only two age categories ($<65$ and $\geq 65$ years) were used to standardize the percentage of negligence.

## RESULTS

We completed the initial review of 30,195 of the 31,429 records (96.1 percent) in the original random sample. Among these, the medical-records analysts found 7817 positive according to the screening criteria. Physicians reviewed 7743 of them at the second-level review. The results reported here are thus based on 30,121 records, including 22,378 with negative screens and 7743 reviewed by physicians. Using the incidence categories described above, the physicians identified 1278 adverse events and 306 adverse events due to negligence (Fig. 1). The incidence rates presented here are based on the 1133 adverse events and 280 negligent ones discovered during 1984 admissions (categories 1, 4, and 5; Table 1).

We estimated the statewide incidence rate of adverse events to have been 3.7 percent (95 percent confidence interval, 3.2 to 4.2) and the rate of adverse events due to negligence to have been 1.0 percent (95 percent confidence interval, 0.8 to 1.2). The percentage of adverse events due to negligence was 27.6 percent (95 percent confidence interval, 22.5 to 32.6). Using the weighting procedure, we calculated that of the 2,671,863 patients discharged from acute care hospitals in New York State in 1984, there were 98,609 adverse events and 27,179 adverse events due to negligence.

Most adverse events (mean [$\pm$SE], 56.8$\pm$1.6 percent) resulted in minor impairment with complete recovery in one month. Another 13.7$\pm$1.1 percent led to disabilities that lasted more than one but less than six months. However, 2.6$\pm$0.4 percent of the adverse events gave rise to permanent total disability, and 13.6$\pm$1.7 percent caused death. Extrapolating to the state of New York in 1984, we estimated that 2550 patients suffered permanent total disability and that 13,451 died at least in part as a result of adverse events (Table 2).

Negligence was more frequent in patients who had more severe adverse events. Of the adverse events that

The New England Journal of Medicine
Downloaded from nejm.org by BHARANIDHARAN PADMANABHAN on May 17, 2013. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

372                              THE NEW ENGLAND JOURNAL OF MEDICINE                              Feb. 7, 1991

led to temporary disability lasting less than one month, 22.2±2.8 percent were caused by negligence. On the other hand, of those that caused permanent total disability, 34.4±8.1 percent were caused by negligence. In addition, 51.3±6.9 percent of the deaths from adverse events were caused by negligence. These differences in the percentage of negligence according to category were significant (Wald test $\chi^2 = 21.04$, P<0.0001).

We also analyzed the distribution of adverse events among different patient populations. Rates of adverse events increased strongly with increasing age (P<0.0001). Persons 65 or older had more than double the risk of persons 16 to 44 years of age (Table 3).

Unlike the rates of adverse events, the percentage of adverse events due to negligence did not increase monotonically with age, but the rate of negligence among those older than 64 was higher than that of any other age group, a difference that remained after standardizing for DRG risk category.

After standardizing for age and DRG risk category, we found no significant differences between sexes in rates of adverse events (male, 3.8±0.4 percent; female, 3.7±0.4 percent) or in the percentage of adverse events due to negligence (male, 27.4±2.8 percent; female, 25.0±2.8 percent).

Table 4 shows the rates of adverse events and negligence for groups of clinical specialties based on DRG groupings, as well as population estimates for each specialty. Rates of adverse events varied significantly, ranging from a low of 0.6±0.1 percent for neonatal DRGs to a high of 16.1±3.0 percent for vascular-surgery DRGs, a more than 25-fold difference. Rates of negligence did not vary significantly.

We checked the accuracy of our results in several ways. First, we found 154 of the 326 missing records (47.2 percent) in follow-up visits to the six hospitals. The rates of adverse events (2.5 percent) and negligence (0.7 percent) among the missing records were lower than among the records originally reviewed. Second, a test by the medical-records-analysis supervisors of the validity of the screening criteria revealed a sensitivity of 89 percent. Third, the reliability of the judgments by the physicians was comparable to that in our pilot studies.[14] The agreement on the presence of an adverse event was 89 percent (kappa = 0.61). With regard to negligence, the agreement was 93 percent, but the kappa statistic was much lower (0.24) (Table 5).

## DISCUSSION

As part of a comprehensive empirical assessment of medical injury and medical malpractice,[16] we estimated the rates of adverse events and the subgroup of those adverse events caused by negligent care in hospitalized patients in New York State in 1984. Our results should be understood in the context of both medical-malpractice litigation and quality assessment. The concepts of adverse event and negligence are derived explicitly from the theory of tort law, of which medical malpractice is a part. Malpractice litigation is intended in part to promote better-quality care by fixing economic sanctions on those who provide substandard care that leads to injuries. Thus, malpractice litigation should in theory be linked to quality assurance. We left aside the aspects of compensation and corrective justice in tort litigation in this analysis.[20]

Adverse events do not, of course, necessarily signal poor-quality care; nor does their absence necessarily indicate good-quality care. For example, a drug reaction that occurs in a patient who has been appropriately prescribed the drug for the first time is an adverse event, but one that is unavoidable given today's



Figure 1. The Record-Review Process.
Numbers of medical records are shown.

The New England Journal of Medicine
Downloaded from nejm.org by BHARANIDHARAN PADMANABHAN on May 17, 2013. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

Table 1. Categories of Incidence of Adverse Events and Negligence.

| Category | Timing of Adverse Event | Adverse Events* | Adverse Events Due to Negligence* |
|---|---|---|---|
| | | number (percent) | |
| 1 | Occurred and discovered during index hospitalization | 647 (50.6)<br>55,046 (49.4) | 156 (51.0)<br>15,257 (51.2) |
| 2 | Occurred during index hospitalization, discovered during subsequent outpatient care | 78 (6.1)<br>6,327 (5.7) | 7 (2.3)<br>776 (2.6) |
| 3 | Occurred during index hospitalization, discovered during subsequent hospitalization | 67 (5.2)<br>6,526 (5.9) | 19 (6.2)<br>1,857 (6.2) |
| 4 | Occurred during outpatient care before index hospitalization but discovered during index hospitalization | 167 (13.1)<br>16,142 (14.5) | 59 (19.3)<br>6,019 (20.2) |
| 5 | Occurred during earlier hospitalization but discovered during index hospitalization | 319 (25.0)<br>27,420 (24.6) | 65 (21.2)<br>5,903 (19.8) |

*For each category the first row of values indicates the sample count, and the second row the weighted population total.

technology. If, on the other hand, the drug reaction occurs in a patient who is given the drug despite a known sensitivity to it, the adverse event is properly judged to be due to negligence. Such care, which may reasonably lead to successful tort litigation, should be a target of quality-assurance programs.

Using our methods, we estimated that 3.7 percent of the patients hospitalized in 1984 suffered adverse events, whereas the rate of adverse events due to negligence was 1.0 percent. These results may be compared with those of the only other large-scale effort to estimate the incidence of iatrogenic injury and substandard care, the California Medical Association's Medical Insurance Feasibility Study.[11] Investigators there found 870 potentially compensable events (a category comparable to our adverse events) in a convenience sample of 20,864 records, for an overall rate of 4.6 percent. This rate was 26 percent higher than our estimate of 3.7 percent. The California study revealed a negligence rate of 0.8 percent, 20 percent lower than the result of our review.

Because our sample of hospital records was random, we could provide for the first time population estimates of adverse events and adverse events due to negligence. Among the 2,671,863 discharges from New York hospitals in 1984, we estimate that there were 98,609 adverse events. Although 56,042 of them (56.8 percent) led to minimal disability with complete recovery in one month and another 13,521 (13.7 percent) to moderate disability with complete recovery in six months, 2550 (2.6 percent) produced permanent total disability, and 13,451 (13.6 percent) led to death. The burden of iatrogenic injury was thus large.

Even more disturbing was the number of adverse events caused by negligence. We estimated that 27,179 injuries, including 6895 deaths and 877 cases of permanent and total disability, resulted from negligent care in New York in 1984. Under the tort system, all of these could have led to successful litigation. We could not measure all negligent acts, and made no attempt to, but measured only those that led to injury. Medical records are probably a poor source of information on negligence that does not cause injury. Thus, our figures reflect not the amount of negligence, but only its consequences.

The analyses of rates of adverse events and the percentage of adverse events due to negligence according to characteristics of the patient are of special interest. Identifying risk factors for adverse events, whether negligent or not, constitutes a crucial first step toward their prevention, an important goal of quality assurance. In this study, we focused on patient age and sex and on clinical-specialty groups.

To increase the precision of our analyses of risk factors, we standardized the data according to our estimates of the risk of a particular DRG's giving rise to an adverse event. This risk categorization was found to correlate well with the observed rates of adverse events, but not with rates of negligence (Appendix II). The absence of an effect of DRG risk category on negligence was expected, for our physicians' judgments regarding the standard of care reflected the inherent riskiness of a procedure or disease state.

We found that both crude and standardized rates of adverse events increased with age. This suggests that elderly people are at higher risk of an adverse event, and it may reflect in part the fact that older people are likely to have more complicated illnesses and often require more complicated intervention. It may also be ascribable in part to their greater fragility. Such differences highlight the importance of controlling for age when comparing population groups. People over the age of 64 were at higher risk of an adverse event associated with negligence, a finding not readily explained by differences in the severity of illness. Presumably, this means that care for the elderly less frequently meets the standard expected of reasonable medical

Table 2. Population Distribution of Adverse Events According to Category of Disability.*

| Category of Disability | Adverse Events | Adverse Events Due to Negligence | Percentage Due to Negligence |
|---|---|---|---|
| | number (percent) | | |
| Minimal impairment, recovery 1 mo | 56,042 (56.8±1.6) | 12,428 (45.7±3.7) | 22.2±2.8 |
| Moderate impairment, recovery >1 to 6 mo | 13,521 (13.7±1.1) | 3,302 (12.1±2.2) | 24.4±4.8 |
| Moderate impairment, recovery >6 mo | 2,762 (2.8±0.5) | 817 (3.0±1.0) | 29.6±8.6 |
| Permanent impairment, ≤50% disability | 3,807 (3.9±0.6) | 869 (3.2±1.1) | 22.8±6.8 |
| Permanent impairment, >50% disability | 2,550 (2.6±0.4) | 877 (3.2±0.8) | 34.4±8.1 |
| Death | 13,451 (13.6±1.7) | 6,895 (25.4±4.2) | 51.3±6.9 |
| Could not reasonably judge disability | 6,477 (6.6±0.7) | 1,989 (7.3±1.3) | 30.7±5.9 |
| Total† | 98,610 | 27,177 | 27.6±2.4 |

*Plus–minus values are means ±SE.
†Values differ from the sums of those reported above because of rounding.

The New England Journal of Medicine
Downloaded from nejm.org by BHARANIDHARAN PADMANABHAN on May 17, 2013. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

general medicine: cardiology, nephrology, dermatology, neurology, endocrinology, pulmonology, gastroenterology, rheumatology, and hematology. Second, the following specialties were combined in a residual group: dentistry, gynecology, ophthalmology, and otolaryngology. Third, medical back problems (DRG 243) was moved from the orthopedics specialty to the general-medicine specialty. Fourth, psychiatric discharges were not included in this study.

The principal discharge diagnosis was used to measure the risk of adverse events associated with severity of disease. To obtain DRG risk groups, three senior physicians were asked to rate on a scale of 1 (low) to 6 (high) the likelihood that a patient in each of the 470 DRGs would have an adverse event. All DRGs received at least one rating of the likelihood of adverse events. By selecting natural breakpoints in the distribution, we grouped the scores into four risk categories.

The risk groups formed by the physicians' judgments were validated first by comparing the rates of adverse events among these groups with use of the data from the Harvard Medical Practice Study pilot project. They were validated again with the 30,121 observations of this study. Both sets of data exhibited monotonic increases in the rates of adverse events with DRG level. The rate of adverse events according to DRG level in this study is shown in Table 6.

## REFERENCES

1. General Accounting Office. Medical malpractice: six states case studies. Washington, D.C.: Government Printing Office, 1986. (GAO publication no. HRD-87-21.)
2. Idem. Medical malpractice: insurance costs. Washington, D.C.: Government Printing Office, 1986. (GAO publication no. HRD-86-112.)
3. Idem. Medical malpractice: characteristics of claims closed in 1984. Washington, D.C.: Government Printing Office, 1986. (GAO publication no. HRD-87-55.)
4. Florida Academic Task Force for the Review of the Insurance and Tort System. Preliminary fact-finding report on medical malpractice. Gainesville, Fla.: State of Florida, 1987.
5. Department of Health and Human Services. Report of the Task Force on Medical Liability and Malpractice. Washington, D.C.: Department of Health and Human Services, 1987. (DHHS publication no. 190-412/70133.)
6. Siegel DR. An overview of medical malpractice legislation. N Y State J Med 1986; 86:377-91.
7. Robinson G. The medical malpractice crisis of the 1970's: a retrospective. Law Contemp Prob 1986; 49:5-36.
8. Priest G. Modern tort law and its reform. Valparaiso Univ Law Rev 1987; 22:1-38.
9. Nader R. The corporate drive to restrict their victims' rights. Gonzaga Law Rev 1987; 22:15-30.
10. Pear T. Insurers reducing malpractice fees for doctors in U.S. New York Times. September 23, 1990:1.
11. California Medical Association. Report of the Medical Insurance Feasibility Study. San Francisco: California Medical Association, 1977.
12. Steel K, Gertman PM, Crescenzi C, Anderson J. Iatrogenic illness on a general medical service at a university hospital. N Engl J Med 1981; 304:638-42.
13. Couch NP, Tilney NL, Rayner AA, Moore FD. The high cost of low-frequency events: the anatomy and economics of surgical mishaps. N Engl J Med 1981; 304:634-7.
14. Brennan TA, Localio AR, Laird NM. Reliability and validity of judgments concerning adverse events and negligence. Med Care 1989; 27:1148-58.
15. Brennan TA, Localio AR, Leape LL, et al. Identification of adverse events suffered by hospitalized patients: a cross-sectional study of litigation, quality assurance, and medical records at two teaching hospitals. Ann Intern Med 1990; 112:221-6.
16. Hiatt HH, Barnes BA, Brennan TA, et al. A study of medical injury and medical malpractice: an overview. N Engl J Med 1989; 321:480-4.
17. Harvard Medical Practice Study. Patients, doctors and lawyers: studies of medical injury, malpractice litigation, and patient compensation in New York. Boston: Harvard Medical Practice Study, 1990:Technical appendix 5.V.1.
18. New York State Department of Health. Statewide planning and research cooperative system: annual report series, 1984. Albany, N.Y.: Department of Health, 1985.
19. Shah BV. SESUDAAN: standard errors program for computing standardized rates from sample survey data. Research Triangle Park, N.C.: Research Triangle Institute, 1981.
20. Brennan TA. Just doctoring: medical ethics in the liberal state. Berkeley: University of California Press (in press).

The New England Journal of Medicine
Downloaded from nejm.org by BHARANIDHARAN PADMANABHAN on May 17, 2013. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.